The next case for argument is 14-1671, Classen v. Elan Pharmaceuticals. 14-1671, Classen v. Elan Pharmaceuticals. Good morning, Your Honor. This case presents, it's under Rule 271B as to whether or not the safe harbor applies to the activities that are accused of infringement. And that's an important key point of our appeal. It's the activities that are actually accused of infringement. And what are those activities? I'm a little unclear on your infringement theory here. And I understand that, Your Honor. There's the activities that were done in the clinical study. Are you referring to something in the appendix? Yes, I'm looking at appendix A-1539, 1541, and 1651, for example. So this is the clinical study report? Correct. And the clinical study was done by... Maybe I didn't ask the question clearly enough. What is your infringement theory? What conduct is infringing? Is it filing the patent application that's infringing? Yes. Are there sales that are arguably infringing here? There is a sale of the product that was patented and the patents itself. It's not the sale of the product. I'm sorry. It's important that I start in this direction. And I'm getting right exactly to your question because that's the confusion. The clinical study done by a dozen doctors is not being accused of infringement. The clinical study itself would fall under the safe harbor. The clinical study is the activity that creates the database. If you look at the first clause of the claim, which is found in our brief... Which claim are you talking about? Claim 33, which is in our brief at page 25. The claim says, accessing the data source. So that activity is necessarily after the clinical study. But isn't it pursuant to filing a supplemental NDA and therefore falls within 271E1? No, it's not. The clinical study... But that's what the court found. What? That's what the court found, right? Right, because the court found that the clinical study was involved in the NDA and it was filed with the FDA. We don't disagree with that. But the clinical study and conducting the clinical study is not accused of infringement. This was done, again, by a dozen doctors at Elon. Subsequent to the conclusion of the clinical study on October 1st, and I'm looking at page A1539. After October 1st... Can you stop showing that to us? Okay. Because we really can't read it. Correct. In November, there was a pharmaceutical product lifestyle strategy meeting held where Dr. Klassen presented a paper, which included reference to the patent and dispute in the back. And this is at A1505, where he taught what is the patented process, which has nothing to do with the clinical study, which had already been completed in October, completed prior to the November meeting. That was attended by Ms. Pellegrini as well as Ms. Santelli from Elon. Ms. Pellegrini then, at the end of November, filed. One of the patents ensued. One of the patents that are the infringing activity, accused of infringement, not the patent that's being asserted. Filing a patent application isn't an infringing act, no matter what the claims say. It's not making, using, or selling an invention. Actually, filing the patent application is one of the steps of the claim convention. So, actually filing the patent application and getting the patent is an active infringement of Dr. Klassen's patent. So, it seems counterintuitive, but it is, because if you practice the steps... Which claim says filing a patent application? Well, it's claim 131, is the one example we have in here. There's a couple of them that say that. The method of claim 36. You're saying it's a step of the method. What? You're saying it's a step of the method. Step of the method. I thought the commercialization was the step of the method. Well, claim 131 is a dependent claim from claim 36, which depends from claim 33. Was that one of those that was canceled, or is that still alive? That's still alive. The ones we have in here are still alive. Actually, 131 was added during the re-examination. So, you're saying that filing a patent application is commercialization? Yes. You don't get any money out of filing a patent application. In fact, it costs money. So, commercialization is usually selling something or offering a service, not entering a government agency for which you pay a fee. Investing is a commercial transaction. You're taking your money, and you're investing it in something. You're commercializing that money. When you buy inventory, that's a commercial transaction. When you sell inventory, you make profit. But profit and loss are both parts of commercialization. No company exists without expenditures and then returns. That's all part of the commercialization process. So, no, I would disagree. Paying your patent attorney is a step of commercializing whatever your invention is. It's not a profitable step. It costs you money. In this case, it was a very profitable step. What if you don't get the patent? Then it's still part of the commercialization. It was just a bad idea. Just as you buy inventory that you later have to sell off below cost, it's still part of your process. It's still part of your commercial enterprise. Commercialization doesn't mean successful commercialization. It could be unsuccessful commercialization. Not all commercial enterprises are successful. Do you have a definition of commercializing? Is there an ordinary meaning to commercialization? It's actually found in the patent where it gives the examples of getting a patent, intellectual property, and the like, are described in the patent as commercializing commercialization. Just back to the infringement theory. There are three steps. You're not saying that the first three steps, if you do it, are not within the safe harbor. You recognize the first three steps are in the safe harbor, and it's only if you perform those steps and then do the commercializing step. That's the infringement theory? No. The first step is accessing the data source, not creating the data source. Once again, the data source was created and already reported to the FDA before the infringing activity began. This is what we call a second look right. You're saying the FDA stuff is already done, but then when you access it afterwards, it's for another purpose, and so all of that is infringing. Correct. Looking at the claims there, I'm looking at what you described as the claims. Under step two, it says at least one adverse event. Step three says at least one new adverse event. If you've already done it before and we're now on the second round, how can you have a new adverse event? Is that different than the other adverse event you encountered when you were getting ready for the FDA submission? Correct. This is new as in novel, as in patentable. It's the same event, but you look at it to determine whether or not you can get intellectual property, not necessarily patenting, any intellectual property. So you're saying a new adverse event could be the same event, but if you're going to use it for a different purpose, that makes it new? Correct. You think that's a fair interpretation of new? It's the interpretation that's claimed in the patent. Again, the patent describes this all in detail of this is not a patent on how to conduct a clinical study. It's not a patent on how to recognize when there's an adverse event. It's a patent to recognize how you commercialize that. Again, it was part of the pharmaceutical policy's lifecycle strategies, which is how do you continue to retain intellectual property protection for old pharmaceuticals? Just going back to another question. I'm sorry if I'm redundant, but I'm confusing myself here perhaps. But we know your position with respect to filing a patent application. Does your infringement theory also include sales and things that happen subsequent to the patent issuance? If you're talking about the damages theory? Yes. Yes, because we have a product by process or kit claim, which says every time you sell this newly patented whatever it is, every time you sell this newly patented or intellectual property protected commercial product, you are now, that's an act of infringement of not the method claims, but the product by process. You created a commercial product. With respect to the kit claims, if we don't agree with you with respect to the exemption from infringement of accessing and analyzing, but if the kit has that information appended to it, once exempt is it always exempt or is it no longer exempt because it's part of a kit and that is being sold, which is commercializing? Absolutely not. It's absolutely not always exempt once exempt, and that is not something we're arguing. That's fundamental to the law. It's the second look issue. If I do my clinical studies and I get my drug approval and I have my FDA approved drug, my pharmaceutical manufacturing facility has to look back at that information to make sure they make the drug that is now subject to infringement and the like, they have to make it the same way it was made for the clinical study. So one doesn't forget everything in the clinical study when one manufactures a pharmaceutical. So it's fundamental in pharmaceutical law that that activity is exempt while it's being used and done. The activity is exempt, and the activity never becomes unexempt. That clinical study always remains exempt, but if you then manufacture a pharmaceutical that infringes somebody else's patent, you of necessity must be using some of the information from your clinical study, otherwise you're not complying with the FDA. Let me ask you this, Councilman. If we were to agree that the district court extended the safe harbor protections further than they should have gone and we were to send this case back, in light of the Supreme Court's recent guidance in Alice, how does this survive a one-on-one challenge? That issue has not been raised. I understand, but you yourself said this is taking an old idea and sending it around again. Well, not an old idea. Taking an existing patent and repatenting. Taking an existing pharmaceutical and finding new intellectual property that applies to that existing pharmaceutical because of the discovery of something new about that pharmaceutical. So it's not on the same clinical study that existed before. Based upon a clinical study that already existed, it's already been reported to the FDA. We're not going back. We're not saying that study itself had anything to do with infringement. That's still protected by the safe harbor. We're not removing that protection. That protection lasts. But again, the information from pharmaceutical, protected pharmaceutical studies are used every day in the manufacture of non-protective drugs. They're being used here in the manufacture of intellectual property. So it's the information that you're taking a second look at and reusing in the manufacture of intellectual property that covers it. And what the district court got incorrect, and you can see it in their decision, is they said you're accusing the study of infringement. And that's what's been repeated in Elon's brief. You're accusing our study. We're not accusing the study of infringement. It's after that study. And the background and the history is in here where the study ended, they came, they listened to Dr. Klassen, they had exchanges of email, of information. We've got them quoted in here with Dr. Klassen. So that's great. And then people, individuals who are not participants in the study, filed the intellectual property because they identified protection that was available based upon taking a study, not conducting a study, not doing a clinical study. They didn't report any of this. None of these patents were reported to the FDA. Documenting and vendorship wasn't reported to the FDA. It was all reported to the PTO, which was not covered under the safe harbor. How does it survive ALICE? If you look at ALICE Corp. as a different way of looking at novelty versus looking at ALICE Corp. as a different way of looking at Section 101 patentability, I'm not trying to ignore it. Those are two very different questions. It certainly survives 101. This is patentable subject matter. Does it survive ALICE Corp.'s reinterpretation of whether novelty exists or not? Yes, it does. It's kind of lengthy to go into that at this point. But these patents were reexamined. There were two patents. The one patent that survived was reexamined. And the reexamination looked at huge amounts of information about how earlier looks at repatenting have been done. The reexam was like a decade ago, right? The reexam clearly preceded ALICE in all of the cases that the Supreme Court reached out. It barely preceded ALICE. The decision was 2006. The reexamination concluded in 2011. So yes, it preceded ALICE. But ALICE didn't say nothing is novel any longer. Well, the patent here is essentially running a clinical trial, looking at the data from the clinical trial, and then discovering new information that could give it commercial value from looking at the data and doing something to commercialize. That doesn't sound to you like the kind of steps of a patent that the Supreme Court might have a problem with? Let me first correct you. The first step you said is not actually a step. Running a clinical trial is not a step in the patent. It's in the preamble. I thought you said the preamble was limiting, but I may be wrong about that. I thought your position was the preamble was limiting. The method of creating and using data, so you mean the creating part? Yes. You're not creating the data that's in the clinical trial? You're creating the data that's used to make the patent. You're looking at the data in the clinical trial. The data you're creating is the information or knowledge. Yes, but I take that. I'm talking about ALICE here and the steps of a patent, so I don't think it matters whether we're talking about first books or second books with regard to the steps of this patent. I guess my first response is I'd like to be able to brief that. But that said, there was nothing, after a thorough reexamination, there was nothing in the prior art that included the last step, the potential commercial value, identifying the potential commercial value of the second to last step, and the commercializing the newly identified product information based upon the analyzed data. It wasn't in the prior art. And ALICE requires that, not that it sounds familiar to you, but that it actually be found in the prior art. We have to remember that the patents were filed, I believe, in 2000 or 2001. There's a family of these patents. Not last week. In 2000, 2001, evergreening was not even a concept in the pharmaceutical field. Nobody evergreened anything. Patents, your original patent on your blockbuster drug expired and you moved on to the next blockbuster drug. Evergreening wasn't a concept when these patents were filed. So if you take ALICE, go back to when these patents were filed, it sounded completely unknown to everyone in the pharmaceutical industry. Again, remember, by 2001, Dr. Klassen, who has never been employed by a large pharmaceutical company, was the invited final speaker at this conference attended by every pharmaceutical company, including Elon. It was a brand, evergreening was a brand new concept. Okay, I think we're beyond your time. Why don't we hear from your friend and we'll record two minutes if you'd like. May it please the Court. I'm James Monroe on behalf of Elon Pharmaceuticals. Given the conversation, I'd like to focus on the claims, given some of the questions. There was a reexamination. At the beginning of the reexamination, Claim 33, which is at A81, did exist. It was cancelled. That Claim 33 has a last step, commercializing the newly identified product information based upon the analyzed data. That was cancelled. The PTO required Klassen to limit the commercializing step to what was in Claim 36 at that time. Claim 36 reads, Commercializing comprises formatting the data relating to at least one new adverse event associated with exposure to or use of the product, or documenting saying, such as a manufacturer or distributor of the product must inform consumers, users, or individuals responsible for the user, physicians, or prescribers about at least one new adverse event associated with exposure to the use of the product. So the commercializing was limited to that particular type of commercializing, which reads on a product label. That reads on a... So you're saying filing a patent application has nothing to do with what's claimed here. That is correct, Your Honor. In fact, if you look at Claim 35 at that same spot, which precedes Claim 36, it says the commercializing, again, depending upon original Claim 33, it says commercializing step comprises protecting the intellectual property interest in the newly identified product information. The PTO canceled that claim. In fact, the PTO canceled all claims that dealt with protecting intellectual property rights. So it's unfair to go back and look at... Based on 101? Based on prior art. The reasons for allowance, the reason the examiner gave for allowing Claim 36 was that the examiner did not, in that particular examiner, did not find in the prior art informing the users of at least one new adverse event. And that's the reasons for allowance, or A-1484. To the question about Alice, we would contend it's not patentable under Alice. In fact, Alon contends that if the examiner who handled the 674 patent application that went all the way to the board patent, and then was affirmed here, that entire patent was canceled. If the same examiner had handled this case, it's our contention that this would have been canceled also. But of course the 101 Alice issue wasn't before us, right? That is correct. And nor is the issue of can one... Is patenting... Can one get a patent on the idea of patenting something, provided under Article 8 of the Constitution? And if that is the point of novelty, that you figured out you could file a patent application on something, we would argue... Now what about the idea of once exempt, always exempt? If information is exempt under 271E1, if it's then embodied in a PIF, which is sold, is it still exempt or not? I think that would depend on the particular facts of your case. I think in this case, absolutely. Because what was embodied in the kit, that was the product label, which the FDA requires one to include with one's product in order to maintain approval for your product. So if we agree with you and the district court that anything relating to filing the supplemental NDA was exempt, we would have to send it back on the kit claims? No, Your Honor. We would argue that... But you said that was a facts question. No, I'm saying if there was a different factual scenario than our case. In our case, the kit that is accused, and the element that's accused in the kit, is the product label, which is something that the FDA requires, so it still falls under the safe harbor provision. It still falls under the once exempt, always exempt, because the activity... In other words, once exempt, always exempt, in your view. Correct. In the context of you then using the product label, which is that activity of including a product label to maintain approval, is required by the FDA and therefore is exempt. There could be other fact patterns and other kit claims, but under the facts of this case, Alon's activity of selling the product with that label is under the safe harbor provision. What about his argument about the second look, that he wants to say you did all of this for the FDA approval, put that in the drawer, and then you're going through all of this again for purposes of commercial sale? Your Honor, Alon agrees with your earlier question, when you were asking Classen about the issue of second look, that his claims, the Classen claims, preclude the second look theory. Once you've gone through the process before the FDA of identifying the purported adverse event and how you should use the product differently, the new use and view of that adverse event, it's no longer new. If you come back later and look at that exact same data and come to the exact same conclusion, you're not identifying a new adverse event. That identification of the new adverse event occurred during the original clinical trial study. And on that point, I think it's important to also look at the study report that Classen identified at A1540, which was provided to the FDA. On that page of the report, at A1540, it documents the people who analyzed the clinical study. It also identifies the date they did that. Two of those people, Jamin Shaw and Michael Scaife, that are on that page were the identified inventors on the later patent. So I wanted to clear up it was the same people who did that. And there are some two dependent claims, because I don't want to mislead the court. There are two dependent claims that survived the reexamination. One claim said the commercialization step, which I noted was limited to informing the public of your adverse event. It said further comprises documenting inventorship. And then there's another claim from that one that says documenting date of invention. It's unclear what those mean in the abstract referring upon the product label notice claim 36, but the disclosure at A1540 clearly covers the documenting who analyzed the study and when they did it. So therefore, it falls under the safe harbor. One other factual issue I would like to point out. Klassen identified the November 15, 2001 conference, which is purportedly the date that Klassen first gave notice of Klassen's purported rights. As of November 15, 2001, the patent that issued, that still exists following reexamination, did not exist. The 472 patent that survived the reexam did not issue until 2003. That patent did not issue until after the clinical trial, the FDA submission, the approving of the label, and the filing of the patent application. All of those activities occurred before the 472 patent issued. I wanted to point that out given the reference to the November 2001 date. Keep in mind, at the time of the district court proceedings, the 674 patent still existed, which it did issue prior to that date, prior to Alon's activities. My point being, at this stage, there will be no, even if there were a remand, there will be no 271A infringement case still in play because the 472 patent did not exist. So all of the activities, filing the patent application and all of the other activities, occurred prior to the issuance of the patent. With respect to 154D, which was never claimed in Klassen's complaint, but anticipating it will be claimed, I will note all the clinical trials and the submission of the FDA information to the FDA, that also occurred before the November 15th date. How does 271G fit in here, if at all? Alon's position is the precedent is very clear that for 271G to apply, made means manufactured. That you actually manufacture the process used to make the product needs to be a manufacturing process, not… Outside the country. That too. But adding a label wouldn't satisfy the process limitations that are in the product by process claim, would not satisfy the manufactured requirement of 271G. With that, I have no other comments unless you have any questions. Thank you. Let me first address page A1540. Before you do that, I'm sorry to interrupt, but could you address the first point your friend made, which is about the claims that are still alive and in suit? Certainly. And 36, how 35 and the others might include intellectual property and patent applications. Claim 36, which does not refer to the patent application stuff. But that was… Sure. You understand his argument, right? Claim 36 refers to the labeling issue. Claim 131, which depends from Claim 36, incorporates the documenting inventorship. So that's correct. Claim 36 doesn't… I've got claim… Documenting inventorship. Okay. I just used that as an example. There are four now independent claims, 17, 36, 73, and 98, which were dependent claims, but those are the ones that have… Do any of those refer to what 35 says, which is protecting intellectual property interests? What if you mean original Claim 35? And that Claim 35 didn't survive reexamination, did it? Claim 35 did not. 17, 36, how many? One of them did that had that. 36 did, right? That's my understanding. 36. 33 went down, 35 went down, and 36 is what you're asserting. Right. 36 is the one we use as the exemplary claim. My question, are there any… I know you've retained like 30 out of 137 claims. Do any of the claims that you're asserting here explicitly talk about intellectual property, or were those claims all gone? I believe that the ones talking about documenting inventorship are the ones that are intellectual property related. They don't say obtaining intellectual property. Right. I mean, I'm talking about… I'm not talking about documenting inventorship. I'm talking about protecting the intellectual property interest. I understood you were talking about commercialization includes filing the patent application, and I'm wondering what's left of the claims that are left. It seems your friend, I think, was saying that those all went down, and so you're left with 36, which does not have the references to anything dealing with protecting intellectual property. I didn't mean to take up your time, but I thought it was an important point. Only to the extent that the commercializing step, if you look in the patent, includes getting intellectual property as a commercializing step. To the extent that it's in the definition in the patent, it is in there in the commercializing step. There's no patent claims that remain that specifically call out getting intellectual property. So when you say the definition of commercializing step, are you referring to some definition that's included in the specification? Yes, in the specification. Do you happen to have that site here? I don't want to take up all your time on rebuttal. I'm sorry. The only other point I wanted to make in rebuttal was the issue of once exempt, always exempt. Once exempt, always exempt cannot be the rule, and it simply is not the rule. Once again, let's take it out of the context of this patent. Just go to a regular pharmaceutical patent. During your clinical trials, you add element A, element B, and element C together, and you determine the proper ratio and the proper dosing. That's protected because it's a clinical trial. If using those three components was... What's protected is the act of generating the information, which is using an invention, arguably. Right. That's what's protected, using the invention so that you can submit the data to the FDA. Right. So you use some sort of invention to mix these chemicals and figure out the right formula, and you submit it to the FDA. That's all protected. Now, that list of chemicals and their constituent percentages is information that was submitted to the FDA. If you use that information, it's no longer protected. You can't now go make a pharmaceutical using the exact same formula from your study. Doing your study, you are protected using that formula. That formula loses its protection when you go commercial. Otherwise, there would be no such thing as a pharmaceutical patent. That's the basic pharmaceutical patents are, what's the formulation? Okay. That formulation is protected when you're doing the study and generating the information. Once you figure out what that formulation is, if you then go and sell it, you're infringing the brand name's patent on it. So it's not once protected, always protected. The activity once protected is always protected, and that activity is done. The information from activity is once protected and then never again protected. You can't argue that. And that's the same thing with the label. Yes, the activity that generated that label is protected because we want to promote activity. The information isn't protected by a patent though. The product is protected by a patent or a method of making it, but not information relating to it. That's copyright material. Well, except that the labeling is the element of Claim 36, and so it is part of the kit, the final product that's out there, just as each of the ingredients is part of that product. And if we had a formulation patent, no one would argue that using the same ingredients as a clinical study is still protected. It's not. Using the same label generated in a clinical study is now no longer protected. The argument that, oh, wait, the FDA requires us to put a label on there, so therefore it's still protected. The FDA requires you to put certain chemicals in that pharmaceutical, and that's not protected. Just because the FDA requires you to do it while you sell it doesn't go back to protecting it. It may be protected. If the FDA requires you in a limited case where the FDA requires you to continue to practice a method, to continue to certify and verify that your pharmaceutical satisfies the FDA requirements, and that requirement was imposed by the FDA beforehand, in a limited factual circumstance the Supreme Court has said that yes, but that's not what we have here. The activity is done. It's finished. It's over. They've found that. They've developed a label. The fact that the FDA requires the label on the package doesn't mean it's protected because the FDA requires all the ingredients in the patent, and they're not protected if we had a formula patent. So it's simply another piece of our formula patent, which is the pharmaceutical in the jar and the label on the outside of the jar are the two parts of the product, the kit, and those two parts are required by the FDA, but that doesn't mean they're protected by the third-party protection. Okay. Time has expired. We have the argument. We thank both counsel, and we'll take a minute.